UNITED STATES BANKRUPTCY COURT        **FOR PUBLICATION**
SOUTHERN DISTRICT OF NEW YORK
----------------------------X
In re:                      :         Chapter 7
                           :         Case No. 01-15653 (SMB)
NIRVANA RESTAURANT INC.,   :
                           :
         Debtor.       :
----------------------------X
KENNETH P. SILVERMAN, ESQ., :
as Chapter 7 Trustee of    :
Nirvana Restaurant Inc.,   :
                           :
         Plaintiff,    :
                           :         Adv. Pro. No. 04-3390
      -against-       :
                           :
PAUL'S LANDMARK, INC.,     :
                           :
        Defendant.   :
----------------------------X

## POST-TRIAL FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

**A P P E A R A N C E S :**

SILVERMAN PERLSTEIN & ACAMPORA LLP
Attorneys for Plaintiff
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753

      Edward M. Flint, Esq.
      Sarah A. Joos, Esq.
          Of Counsel


SIEGEL & SIEGEL, P.C.
Attorneys for Defendant
205 Lexington Avenue, 17th Floor
New York, New York 10016

      Michael D. Siegel, Esq.
         Of Counsel

**STUART M. BERNSTEIN**
**Chief United States Bankruptcy Judge**

The plaintiff and chapter 7 trustee of the estate of Nirvana Restaurant Inc. ("Nirvana"), Kenneth P. Silverman, Esq., commenced this adversary proceeding to avoid a guaranty given by Nirvana for the benefit of its affiliate, Landmark Club & Restaurant, Inc. ("Landmark Restaurant"), and to recover the rent payments made in connection with the guaranty. The Court conducted a trial on September 12, 2005, at which four witnesses testified and numerous exhibits were received. I conclude that the plaintiff failed to sustain his burden of proof, and accordingly, dismiss the Amended Complaint.

## BACKGROUND

Nirvana, a New York corporation, operated a well-known Indian restaurant at 30 Central Park South, New York, New York. Landmark Restaurant, a New York corporation, was formed in October 1998, (Transcript of Trial, held Sept. 12, 2005 ("Tr."), at 31)(ECF Doc. # 32), to own and manage a club and restaurant at 313 East 58th Street, New York, New York (the "Premises"). (Defendant's Exhibit ("DX") 3, at PL-6.) Nirvana Cuisine, Inc. was the sole shareholder of Nirvana and Landmark Restaurant, (Joint Pre-Trial Order, dated July 26, 2005, at ¶ 5)(ECF Doc. #

23), and Shamsher Wadud was the sole shareholder of Nirvana
Cuisine. (Tr. at 31-32.)

The defendant, Paul's Landmark, Inc. owned the Premises.
(Id. at 52, 108.) Landmark Realty LLC ("Landmark Realty"), a New
York limited liability company, was formed to purchase the
Premises. (Id. at 44.) Josephine Castellano was the Managing
Member and 100% owner of Landmark Realty at the time of its
formation. (See DX 4, at PL 63, ¶ 1.)

## A.   The Initial Transactions

### 1.   The Lease

On October 13, 1998, the defendant entered into a five year
lease (the "Lease") with Landmark Restaurant for the purpose of
allowing Landmark Restaurant to operate a club and restaurant at
the Premises. (DX 3, at PL 6-29.) The fixed annual rent for the
first year was $268,000; the fixed annual rent rose to $360,000
over the next four years. (Id., at PL 6, ¶ 2.) "Additional
rent" included "all sums in addition to Fixed Rent" payable by
Landmark Restaurant to the defendant under the Lease, (id., at PL
29, at ¶ 29(o)), such as the reasonable cost of any maintenance
and repairs, (id., at PL 8, ¶ 4), the satisfaction of mechanics
liens, (id., at PL 8-9, ¶ 5(b)), and the cost of maintaining
insurance. (Id., at PL 10, ¶ 6(d).) Wadud personally guaranteed

3

Landmark Restaurant's obligations under the Lease. (<u>Id.</u>, at PL 30-31.) Landmark Restaurant took possession of the Premises immediately after the Commencement Date, and began construction. (Tr. at 55.)

### 2. The Purchase Agreement

On or about October 13, 1998, Landmark Realty, as buyer, and the defendant, as seller, executed a contract of sale (the "Purchase Agreement") pursuant to which Landmark Realty agreed to buy the Premises for the sum of $1.3 million. (DX 16.) A deposit of $130,000.00 was tendered. (Tr. at 45, 109) Josephine Castellano supplied 50% of the down payment, and Nirvana provided the other 50%. (<u>Id.</u> at 45.) The purchase was to close on January 12, 1999, but did not. (<u>Id.</u> at 112.) Instead, the Purchase Agreement was amended in January 1999, (DX 3, at PL 42-46), to extend the closing date to March 1999. In addition, the deposit was turned over to the defendant as consideration for the extension of the closing date. (<u>Id.</u>, at PL 43.)

### B. The March 26, 1999 Transactions

### 1. Second Amendment to Lease

On March 26, 1999, the defendant and Landmark Restaurant executed a second amendment to the Lease ("Second Amendment"). (DX 3, at PL 2-3.) The Second Amendment reduced the Lease Term

4

to one year ending on March 31, 2000.  It also reduced the rent prospectively to $14,183.80, and required Nirvana to execute a guaranty (the "Guaranty").

### 2.    The Guaranty

In accordance with the Second Amendment, Nirvana delivered a "good guy" guaranty.  (_Id._, at PL 4-5.)  The Nirvana Guaranty was an "essential component" of the transactions because Nirvana had financed the restaurant construction, and was the only deep pocket.  (Tr. at 118.)  The Guaranty obligated Nirvana to answer for any defaults by Landmark Restaurant in the payment of fixed or additional rent until such time as the defendant regained possession of the premises free and clear of all tenants, subtenants, occupants and mechanics liens filed in connection with Landmark Restaurant's work.  The Guaranty also extended to any modifications of the Lease, and to any extensions or renewals of the term of the Lease.

### 3.    Right of First Refusal Agreement

By March 26, 1999, Landmark Realty's rights under the Purchase Agreement had terminated.  On the latter date, Landmark Realty and the defendant entered into a Right of First Refusal Agreement.  (DX 3, at PL 60-61.)  Landmark Realty received the

right, lasting until February 28, 2000, to match any <u>bona fide</u> offer received by the defendant for the sale of the property.

### 4.   The Sale of Landmark Realty

Finally, pursuant to an agreement dated March 26, 1999, Castellano sold her 100% interest in Landmark Realty to Nirvana for $211,000.  (DX 4.)

## C.   The May 18, 1999 Transactions

### 1.   Third Amendment to Lease

By an Amendment to Lease Agreement, dated May 18, 1999 ("Third Amendment")(DX 3, at PL 47-58), the Lease was extended to March 31, 2014.  (<u>Id.</u>, at PL 47, ¶ 1.)  The fixed rent for the first year, beginning on April 1, 1999, remained the same – $14,183.80 per month.  (<u>See id.</u>, at PL 47, ¶ 2.)  During years two through four, the fixed rent declined to $144,000, or $12,000 per month.  (<u>Id.</u>, at PL 48, ¶ 2.)  Thereafter, the fixed rent rose, and during the final five years, equaled the "Fixed Net Rent" as computed at that time.  (<u>Id.</u>)  The Guaranty extended to these new obligations.

### 2.   Right of First Refusal

Landmark Realty and the defendant entered into an agreement that terminated Landmark Realty's right of first refusal granted

only seven weeks earlier. (DX 5.) In its stead, Landmark Restaurant was granted a similar right of first refusal under the Third Amendment. (DX 3, at PL 57-58, ¶ 5.)

## D.   The Transfers

Landmark Restaurant opened for business in May 1999, and remained open intermittently for a few months. (Tr. at 62.) It stopped operating some time in 2000. (Id. at 63.) Prior to opening, Nirvana had funded in excess of $500,000 of Landmark Restaurant's construction costs.[1] (Id. at 137.) After Nirvana signed the Guaranty, it transferred $249,710.47 (the "Transfers") to the defendant on account of Landmark Restaurant's monthly rent obligation under the Lease. (See id. at 40-41.) The following chart summarizes the timing and amount of the Transfers:

| Date Paid | Amount of Each Transfer |
|-----------|-------------------------|
| 4/1/99    | $14,183.80              |
| 5/13/99   | $14,183.80              |
| 6/7/99    | $14,183.80              |
| 7/1/99    | $14,183.80              |
| 8/1/99    | $14,183.80              |
| 9/1/99    | $14,183.80              |
| 10/1/99   | $14,183.80              |
| 11/5/99   | $14,544.78              |
| 12/1/99   | $14,183.80              |

---

[1]    The plaintiff is not seeking to recover these payments in this lawsuit.

7

| | |
|---|---|
| 1/1/00 | $14,183.80 |
| 2/1/00 | $14,183.80 |
| 5/1/00 | $15,588.49 |
| 7/7/00 | $10,000.00 |
| 7/31/00 | $13,382.73 |
| 8/25/00 | $15,588.99 |
| 9/1/00 | $15,589.99 |
| 9/9/00 | $15,588.49 |
| 12/31/00 | $7,589.00 |
| | **$249,710.47** |

(Amended Complaint at ¶ 19; see Tr. at 200-01, 203(acknowledging
agreement on schedule of Transfers set forth in the Amended
Complaint).)  All but the final Transfer were made more than one
year before Nirvana's November 6, 2001 petition date.


**E.    This Litigation**

The plaintiff commenced this adversary proceeding on July 9,
2004.  The Amended Complaint, (ECF Doc. # 9), consists of nine
counts, and seeks to avoid the Guaranty and the Transfers on the
theory that they were actually or constructively fraudulent under
New York law, see N. Y. DEBT. & CRED. LAW, §§ 270, et. seq.
(McKinney 2001)("NYDCL"), and federal bankruptcy law, see 11
U.S.C. § 548(a).


Two aspects of the Amended Complaint may be disposed of
without extended discussion.  First, the plaintiff failed to

prove an actual intent to defraud, limiting him to claims based on constructive fraud. Second, the plaintiff is not entitled to any relief under the constructive fraudulent transfer provisions in 11 U.S.C. § 548.[2] Although it closely parallels New York fraudulent conveyance law, § 548 only reaches back to transactions that occurred within one year of the petition date. For the reasons explained below, the plaintiff must avoid the Guaranty in order to avoid and recover the Transfers. The Guaranty was executed more than two years before the petition date, and accordingly, the plaintiff must pursue his claim under the constructive fraudulent conveyance provisions of New York law.

---

[2]     Section 548 states, in pertinent part, as follows:

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily -

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

## DISCUSSION

### A.   Introduction

Generally, a person challenging a transfer of the debtor's property as constructively fraudulent under New York law must show that it was made without fair consideration and (1) the debtor was insolvent or was rendered insolvent by the transfer, NYDCL § 273, (2) the debtor was left with unreasonably small capital, id., § 274, or (3) the debtor intended or believed that it would incur debts beyond its ability to pay when the debts matured.   Id., § 275.   See Geron v. Schulman (In re Manshul Constr. Corp., No. 97 Civ. 8851, 2000 WL 1228866, at *51 (S.D.N.Y. Aug. 30, 2000); MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co., 910 F. Supp. 913, 936 (S.D.N.Y. 1995); Le Café Creme, Ltd. v. Le Roux (In re La Café Creme, Ltd.), 244 B.R. 221, 240-41 (Bankr. S.D.N.Y. 2000).


In each case, the plaintiff must show that the debtor did not receive "fair consideration."   See NYDCL §§ 273, 274, 275; United States v. McCombs, 30 F.3d 310, 323 (2d Cir. 1994); ACLI Gov't Secs., Inc. v. Rhoades, 653 F. Supp. 1388, 1391 (S.D.N.Y. 1987), aff'd, 842 F.2d 1287 (2d Cir. 1988)(table mem.).   Under NYDCL § 272,

10

Fair consideration is given for property, or obligation,

a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied . . . .

"Fair consideration" includes the satisfaction of an "antecedent debt." A guaranty is an "antecedent debt," and the payment on account of an pre-existing guaranty is, therefore, supported by "fair consideration." See Official Comm. of Unsecured Creditors v. Conceria Sabrina S.P.A. (In re R.M.L., Inc.), 195 B.R. 602, 618 (Bankr. M.D. Pa. 1996)(payment of guaranty is given for "reasonably equivalent value"); Marshack v. Wells Fargo Bank (In re Walters), 163 B.R. 575, 581 (Bankr. C.D. Cal. 1994)(payment on guaranty was made on account of "antecedent debt"). Conversely, if the Guaranty is avoided as a fraudulent obligation, it cannot serve as "fair consideration" for the subsequent Transfers. See Demptster v. Overview Equities, Inc., 773 N.Y.S.2d 71, 74 (N.Y. App. Div. 2004)(unenforceable obligation cannot constitute "fair consideration"); cf. Central Hanover Bank & Trust Co. v. United Traction Co., 95 F.2d 50, 55 (2d Cir. 1938)("It has never been deemed a fraudulent conveyance to pay an honest debt or to perform an obligation which the obligor was under a moral duty to perform, although the debt or obligation

11

was legally unenforceable because of some statutory
provision.")(Emphasis added.)    The plaintiff tried the case on
this theory, (see Post-Trial Memorandum of Law Submitted on
Behalf of Plaintiff Kenneth P. Silverman, Esq., as Chapter 7
Trustee of Nirvana Restaurant, Inc., dated Dec. 7, 2005, at 2
("The key issues tried are whether the Defendant gave and the
Debtor received value in exchange for the Guaranty and whether
the Debtor was solvent before it gave the Guaranty."))(ECF Doc. #
26); hence, we turn to the question of whether the Guaranty was
constructively fraudulent under New York law.[3]

**B.    Did Nirvana Receive "Fair Consideration"?**

**1. Introduction**

It is undisputed that Nirvana did not receive any direct
benefit from the Guaranty.    The Guaranty induced the defendant to
execute the Second Amendment and grant Landmark Restaurant
another year of occupancy.    Nirvana, however, neither occupied
nor had the right to occupy the Premises.

---

[3]    In Rubin v. Manufacturers Hanover Trust Co., 661 F.2d 979 (2d Cir. 1981), the Court
ruled that under § 67(d)(2) of the former bankruptcy act of 1898, the guarantor of a line of credit
incurred an "obligation" for fraudulent conveyance purposes when the principal debtor
subsequently borrowed money  (i.e., used the line of credit) rather than when the guaranty was
executed.  Id. at 990.  The plaintiff did not make a similar argument in this case.

Nevertheless, the consideration does not have to flow directly to the debtor to be "fair" and support the obligation. A debtor can receive "fair consideration" indirectly through a benefit conferred on a third party provided that "the value of the benefit received by the debtor approximates the value of the property or obligation he has given up." Rubin v. Manufacturers Hanover Trust Co., 661 F.2d 979, 991-92 (2d Cir. 1981). Indirect benefits may include consideration flowing from the debtor to the guarantor, synergy, increased access to capital, safeguarding a source of supply and protecting customer relationships. Leibowitz v. Parkway Bank & Trust Co. (In re Image Worldwide, Ltd.), 139 F.3d 574, 578-79 (7th Cir. 1998). The indirect benefit from a guaranty will not be recognized unless it is "fairly concrete." Id. at 578. The value of what Nirvana gave and received must be determined as of the time that it signed the Guaranty. See Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.), 92 F.3d 139, 152 (3d Cir. 1996).

## 2.   The Value Given and Received

The obligations that Nirvana undertook by signing the Guaranty are difficult to quantify because they were contingent and open-ended. The Second Amendment reduced the Lease term to

one year at a fixed rent of approximately $170,000. Furthermore, the Guaranty covered all fixed and additional rent until the defendant recovered possession free of tenants, subtenants, occupants and mechanics liens. The defendant was particularly concerned about unsatisfied mechanics liens generated by Landmark Restaurant's construction work, and wanted a deep pocket – Nirvana – on the hook to satisfy them. (<u>See</u> Tr. at 120-21, 139, 141.)

The Guaranty essentially converted Nirvana's voluntary payment of Landmark Restaurant's construction costs and rent into a contractual obligation. Nirvana now had to pay the construction costs; otherwise, the contractor could file a mechanics lien, and if the defendant discharged the lien (Landmark Restaurant had no money), Nirvana would have to answer for the payment as additional rent under the Guaranty. Similarly, Nirvana was liable under the Guaranty for at least one year of fixed rent. Although the Guaranty was a "good guy" guaranty, there was no evidence that at the time of the Guaranty, Landmark Restaurant was likely to quit the Premises during the year. Finally, Nirvana had to answer for all of the fixed and additional rent obligations created by a modification or extension of the Lease.

14

The Guaranty therefore reflected a substantial contingent obligation. And although contingent, it was more probable that Nirvana, rather than Landmark Restaurant, would pay the principal debt. To this point, Nirvana had paid all of Landmark Restaurant's expenses because no other money was available. (Tr. at 58.) Landmark Restaurant was a start up operation without any reputation or customer base, and had not even opened as of March 26, 1999.

Accordingly, even without the benefit of hindsight it appeared likely on March 26, 1999, that Nirvana would have to continue to pay Landmark Restaurant's fixed rent of approximately $170,000 for the one year term under the Second Amendment.[4] In addition, on April 5, 1999, Nirvana paid $92,000 to Landmark Restaurant's contractor, Professional Heating & Plumbing, when the construction was nearly complete and the restaurant was about to open. (Tr. at 61-62.) Absent that payment, Professional Plumbing could have filed a mechanics lien, and Nirvana had to have contemplated that payment when it signed the Guaranty on March 26, 1999. What, then, did Nirvana receive in exchange for assuming these substantial, foreseeable obligations?

---

[4]     In fact, Nirvana paid Landmark Restaurant's rent for 11 of the 12 months encompassed by the Second Amendment.

15

The defendant identified two indirect and prospective benefits to Nirvana: the greater likelihood of recovering the construction and other costs advanced to or for the benefit of Landmark Restaurant, and the chance to exercise the right of first refusal held by Landmark Realty, Nirvana's wholly-owned subsidiary.[5] In determining whether prospective benefits constitute "fair consideration," the court must determine the likelihood that the debtor will actually realize those benefits. See In re R.M.L., Inc., 92 F.3d at 153 (discussing "reasonably equivalent value" under § 548 of the Bankruptcy Code).

The March 1999 transactions gave Landmark Restaurant the opportunity to open and operate for approximately one year, and in turn, to recapture the investment and buy the Premises. (Tr. at 118.) The evidence does not support a finding that the parties contemplated a longer lease at that time even though they extended the Lease term two months later.

---

[5]    Although Landmark Restaurant and Nirvana shared a common owner, there was no proof of any synergy between them. Nirvana already operated as a restaurant, and Wadud planned to operate Landmark Restaurant as a restaurant too. Beyond that, however, there was no evident connection. They maintained separate books and records, and had their own employees, payrolls and bank accounts. (See Tr. at 32-33.) In addition, Nirvana Cuisine, the common parent, maintained its own books and records. (Id. at 43.) Thus, the affiliate relationship alone did not make the exchange a fair one. Cf. In re Augie/Restivo Baking Co., 87 B.R. 242, 247 (Bankr. E.D.N.Y. 1988)(noting likelihood that where "two corporations were operating as a single economic unit, it is virtually impossible for money to have been advanced to one without the benefit to the other").

There was little if any likelihood that Landmark Restaurant would make use of the chance given by the one year lease. As noted, the restaurant was not even open for business. Furthermore, in the three years preceding the Guaranty, Nirvana's highest reported net income was only $100,008 for the year ended April 30, 1999. (DX 48, at no. 001149.) Nirvana was an established restaurant operating on Central Park South. It is unlikely that Landmark Restaurant, a new restaurant yet to open, would match Nirvana's performance during the partial year of operations afforded by the Second Amendment.

In short, Landmark Restaurant's debt to Nirvana represented a "sunk cost," and Nirvana did not receive a benefit by throwing good money after bad. The chance that Landmark Restaurant would eventually open, make enough to pay its own expenses, including those guaranteed by Nirvana, and also earn enough to repay at least some of Nirvana's debt to the defendant, was highly speculative.

Furthermore, the indirect benefit granted by the right of first refusal was also illusory. Its value depended on the defendant finding another buyer for the Premises at a price that made the exercise of the right of first refusal economically

17

desirable.   The right expired in 11 months (in fact, the parties terminated it and transferred the right of first refusal to Landmark Restaurant less than two months later.)   There is no evidence that the defendant was marketing the Premises, or even contemplated marketing the Premises, at the time that the Guaranty was signed.   Accordingly, I find that as of March 26, 1999, the chance of exercising the right of first refusal was virtually nil, and without value.

The defendant's principal "fair consideration" case, <u>Butler Aviation Int'l, Inc. v. Whyte (In re Fairchild Aircraft Corp.</u>), 6 F.3d 1119 (5th Cir. 1993), is distinguishable.   There, the debtor, Fairchild, manufactured aircraft.   Air Kentucky was one of its customers, and was also important to Fairchild's business based upon Air Kentucky's code-sharing relationship with USAir.   <u>Id.</u> at 1123.   Consequently, Fairchild took several steps to help Air Kentucky weather its financial problems, including selling aircraft to Air Kentucky on favorable terms, providing used aircraft at no cost and lending money.   <u>Id.</u>

When USAir terminated the code-sharing relationship, and fuel suppliers refused to deliver any more fuel on credit, Air Kentucky faced certain demise with serious consequences for

18

Fairchild.  Id. at 1123-24.  To keep Air Kentucky operating and marketable, the debtor paid for the fuel supplied to Air Kentucky by Butler Aviation.  Id. at 1124.

The fiscal agent appointed to pursue Fairchild's avoidance actions subsequently commenced a fraudulent transfer action against Butler Aviation to recover the fuel payments.  The issue presented was whether "keeping Air Kentucky operating during this period was worth $16,000-$20,000 a week, or its 'reasonable equivalent,' to Fairchild."  Id. at 1126.  The court identified several benefits.  Fairchild avoided taking back three airplanes, which would have disrupted its future sales.  In addition, Air Kentucky's sudden cessation would have seriously damaged Fairchild's relationship with USAir, a potential major customer. Id.  Fairchild's support also kept Air Kentucky marketable.  This enhanced the prospect of recouping some of the millions invested in Air Kentucky and also increased the chance of selling more aircraft to a new customer.  Id.  In the end, Fairchild took a risk that yielded a potentially high reward and generated cognizable value.  Id.

Fairchild does not stand for the proposition that a creditor gets "fair value" simply by throwing more money at one of its

19

debtors in the hope of keeping it in business long enough to repay part of the debt.  In contrast to the relationship between Fairchild and Air Kentucky, Nirvana and Landmark Restaurant did not enjoy any synergy, and Nirvana did not derive any benefit from Landmark Restaurant's existence.  In fact, the relationship was one-sided – Nirvana had to cover Landmark Restaurant's substantial expenses.  The Guaranty did not involve a risk that yielded a potentially high reward to Nirvana since, as noted, the chance of recovering its investment was slim to non-existent.

In conclusion, Nirvana incurred substantial contingent obligations when it signed the Guaranty.  The indirect benefits that it received – the possible repayment of its substantial loans or the exercise of the right of first refusal during the next eleven months – did not provide "fair consideration" to Nirvana.

## C.   Insolvency

In addition to the absence of "fair consideration," the NYDCL requires the plaintiff to demonstrate one of the adverse financial conditions listed in the relevant statutes.  The most commonly litigated financial condition is "insolvency."  NYDCL § 273 provides:

20

> Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

If the plaintiff shows the absence of "fair consideration," the burden of going forward with proof of insolvency shifts to the defendant. Feist v. Druckerman, 70 F.2d 333, 334-35 (2d Cir. 1934); Manshul, 2000 WL 1228866, at * 53 United States v. Hansel, 999 F. Supp. 694, 699 (N.D.N.Y. 1998); MFS/Sun, 910 F. Supp. at 938; ACLI, 653 F. Supp. at 1393; Corbin v. Franklin Nat'l Bank (In re Franklin Nat'l Bank Sec. Litig.), 2 B.R. 687, 710 (E.D.N.Y. 1979), aff'd, 633 F.2d 203 (2d Cir. 1980)(Table mem.); Hassett v. Far West Fed. Savs. & Loan Ass'n (In re O.P.M. Leasing Servs., Inc.), 40 B.R. 380, 393 (Bankr. S.D.N.Y.), aff'd, 44 B.R. 1023 (S.D.N.Y. 1984), aff'd, 769 F.2d 911 (2d Cir. 1985). The party defending the conveyance need only come forward with some evidence of solvency to rebut the presumption, as the burden of persuasion and the risk of non-persuasion remain with the party challenging the conveyance. Manshul, 2000 WL 1228866, at * 53; MFS/Sun, 910 F. Supp. at 938.

Because the plaintiff demonstrated the absence of "fair consideration," the burden shifted to the defendant to go forward

21

with evidence of solvency as of the time of the Guaranty.  Under

NYDCL § 271(1):

> A person is insolvent when the present fair
> salable value of his assets is less than the amount
> that will be required to pay his probable liability on
> his existing debts as they become absolute and matured.

Section 271, like its Bankruptcy Code analogue, 11 U.S.C. §

101(32), uses a balance sheet test.[6]  <u>Hirsch v. Gersten (In re

Centennial Textiles, Inc.</u>), 220 B.R. 165, 173 (Bankr. S.D.N.Y.

1998)(citing <u>United States v. 58th Street Plaza Theatre, Inc.</u>, 287

F. Supp. 475 (S.D.N.Y. 1968); <u>see</u> <u>Morgan Guaranty Trust Co. v.

Hellenic Lines, Ltd.</u>, 621 F. Supp. 198, 220 (S.D.N.Y.

1985)(neither cash flow nor the ability to pay current

obligations is a factor in determining insolvency).  For the

purpose of insolvency, "fair salable value," like its Bankruptcy

Code counterpart "fair valuation," is determined, in the going

concern context, "by the fair market value of the debtor's assets

that could be obtained if sold in a prudent manner within a

reasonable period of time to pay the debtor's debts."  <u>Lawson v.

Ford Motor Co. (In re Roblin Indus., Inc.</u>), 78 F.3d 30, 35 (2d

---

[6]    Under § 101(32), "insolvent" refers to a

financial condition such that the sum of such entity's debts is greater than all of
such entity's property, at a fair valuation.

22

Cir. 1996)(discussing insolvency under the Bankruptcy Code); see Rubin, 661 F.2d at 995 (discussing "present fair saleable value" under the Bankruptcy Act of 1898); Syracuse Engineering Co., Inc. v. Haight, 110 F.2d 468, 471 (2d Cir. 1940)(discussing "bankruptcy insolvency" under the bankruptcy act of 1898).

       The starting point is the balance sheet. Although book value does not ordinarily reflect an accurate market value, book value nevertheless provides some evidence of the debtor's solvency. Roblin, 78 F.3d at 35; Greene v. Ellis, 335 F. Supp. 981, 982 (S.D.N.Y. 1971), aff'd, 456 F.2d 1335 (2d Cir. 1972)(Table mem.) The aim is to reconstitute the balance sheet to reflect the market value of the assets and liabilities more accurately. See Franklin Nat'l Bank, 2 B.R. at 701 (the starting point for determining the value of stock is the book value). The court should disregard assets that cannot be sold, Moody v. Sec. Pac. Bus. Credit, Inc., 971 F.2d 1056, 1067 (3d Cir. 1992); Franklin Nat'l Bank, 2 B.R. at 711, and ignore booked entries that lack documentary support. United States Trust Co. of New York v. Gill & Duffus, Inc., 592 N.Y.S.2d 327, 327 (N.Y. App. Div. 1993); 30 N.Y. Jur.2D, CREDITORS' RIGHTS AND REMEDIES § 304, at 403 (1997)("Only the salable assets enter into the equation in determining insolvency under the statute.")

23

The defendant called an expert witness, Alex Linden, who testified, in substance, that Nirvana's books and records accurately reflected the value of its assets as of the date that the Guaranty was signed. Nirvana's balance sheet for the fiscal year ending April 30, 1999, indicated total assets of $657,986, total liabilities of $358,861, and shareholders' equity of $299,125. The Guaranty was signed only one month earlier, and the balance sheet was the most probative evidence of Nirvana's solvency on March 26, 1999.

In fact, the only disagreement between Linden and the plaintiff's expert, Russell Kranzler, concerned the timing of the adjustments both agreed had to be made to the value of three significant assets. (Tr. at 152.) The book values of the three assets, and the values attributed to them as of April 30, 1999 by the parties' experts, are shown in the following chart:

| Asset | Book Value | Plaintiff | Defendant |
|---|---|---|---|
| Other Investments | 35,451.00 | 0.00 | 35,451.00 |
| Contract Deposits | 390,000.00 | 0.00 | 390,000.00 |
| Intangible Assets | 8,511.00 | 0.00 | 8,511.00 |
| | 433,962.00 | 0.00 | 433,962.00 |

Linden maintained that the assets should have been adjusted at some time after the Guaranty was signed, while Kranzler opined that the assets were worthless at the time of the Guaranty. We need not tarry long over the disagreement involving the "Other Investments" and "Intangible Assets." They aggregated $43,962. Even if they were adjusted to zero as of April 30, 1999 (and hence, March 26, 1999) for solvency purposes, they would not affect Nirvana's solvency.

Instead, the determination of solvency or insolvency hinges on the "fair salable value" of the "Contract Deposits" at the time of the Guaranty. The "Contract Deposits" related to the contract to purchase the condominium unit (the "Unit") from which Nirvana conducted business at 30 Central Park South. On or about July 18, 1995, 30 Central Park South Realty Company ("CPS"), as seller, and Rooftop Restaurant, Inc. ("Rooftop"), as purchaser, had entered into a Purchase Agreement (the "1995 Contract") for the sale and purchase of the Unit. (Kranzler Report, at 1.)[7] On August 30, 1996, Rooftop assigned the 1995 Contract to Nirvana. (Id. at 1-2.)

---

[7]    Kranzler's expert report was received in evidence as Plaintiff's Exhibit ("PX") AA.

Each month, Nirvana paid $10,000.00 toward the purchase price of the Unit. (DX 49, at Bates no. 000543.) The "Contract Deposits" reflected these payments. (Tr. at 187.) Kranzler opined that the "Contract Deposits" "didn't exist," and had "no value to Nirvana," (id. at 77-78), because they were reported on Nirvana's tax returns as a "loan and exchange" and there was no note to support them. (Id. at 78.)

There is no reason why there should be. Regardless of how it was reported – Kranzler testified that GAAP was immaterial to the question of solvency, (id. at 78) – the asset reflected the deposit for the purchase of the Unit. It was the same as a down payment on a house. There is no market for down payments, and a home buyer does not generally receive a note in the amount of the down payment that he can then sell or discount. Rather, the buyer receives dollar for dollar credit against the purchase price provided that the transaction closes.

The same holds true for the "Contract Deposits." Nirvana owned the 1995 Contract at the time it executed the Guaranty. No evidence was offered to suggest that it did not intend to close the transaction, and it would have received a dollar for dollar credit against the purchase price at that time. It is true that

26

Nirvana assigned the 1995 Contract for no consideration to its parent, Nirvana Cuisine, on October 1, 1999. (Kranzler Report, at 2.) The post-Guaranty assignment may have been a fraudulent conveyance, but did not transform the down payment into a valueless "asset" nunc pro tunc to the date of the Guaranty.[8] Consequently, the value of Nirvana's assets should be reduced for solvency purposes as of April 30, 1999, by the amount of $43,962, and a corresponding reduction in the value of the equity from $299,125 to $255,163 should be made, leading to a finding that Nirvana was solvent at the time it signed the Guaranty.

Lastly, the plaintiff argued in his post-trial submission that the liabilities should be increased by $170,205.60, the fixed rent due under the Second Amendment. Neither expert testified that this adjustment should be made, but in any event, the dispute is immaterial, at least for solvency purposes. If this amount is added to Nirvana's liabilities, and the equity is reduced in a corresponding amount, Nirvana would still have had

---

[8]     After his appointment, the trustee commenced an adversary proceeding to avoid the transfer of the 1995 Contract and recover the amounts that Nirvana had paid toward the purchase price. (See Silverman v. Nirvana Cuisine, Inc. Adv. Proc. # 03-9637)(ECF Doc. # 1.) The trustee obtained a default judgment avoiding the transfer of the 1995 Contract and declaring that the latter was property of the Nirvana estate. (Id., ECF Doc. # 21.) Since trustees do not ordinarily pursue the recovery of worthless property, see Bear, Stearns Secs. Corp. v. Gredd, 275 B.R. 190, 195 (S.D.N.Y. 2002) ("[C]reditors must actually be harmed in order to avoid a fraudulent transfer under [11 U.S.C. § 548]."), his actions imply that the 1995 Contract and the Contract Deposits had value.

positive net worth and would have been solvent at the time of the Guaranty.

Accordingly, I conclude that the plaintiff failed to prove that he is entitled to avoid the Guaranty under NYDCL § 273.

## D.   Unreasonably Small Capital

NYDCL § 274 states:

> Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent.

Section 274 is derived <u>verbatim</u> from § 5 of the Uniform Fraudulent Conveyance Act (the "UFCA").   <u>See</u> 7A, Pᴛ. II, Uɴɪꜰᴏʀᴍ Lᴀᴡꜱ Aɴɴᴏᴛᴀᴛᴇᴅ, Bᴜꜱɪɴᴇꜱꜱ ᴀɴᴅ Fɪɴᴀɴᴄɪᴀʟ Lᴀᴡꜱ 105 (1999)("ULA").   It differs in one important respect from the other constructive fraudulent conveyance provisions; NYDCL § 274 does not invalidate fraudulent obligations.[9]   The Guaranty was an "obligation" rather than a "conveyance," <u>cf. Covey v. Commercial Nat'l Bank</u>, 960 F.2d

---

[9]      The Court has not been able to locate an explanation for this distinction.  The corresponding provisions of the Bankruptcy Code, § 548 (a) (1) (B)(i)-(ii)(II) , and the Uniform Fraudulent Transfer Act ("UFTA"), § 4 (a) (2)(i), invalidate transfers <u>and</u> <u>obligations</u> that leave a debtor engaged or about to engage in business with "unreasonably small capital" or "remaining assets," respectively.

28

657, 661 (7th Cir. 1992)("Although a note or guarantee is not a "transfer" for purposes of 11 U.S.C. § 101(54), . . . both note and guarantee are obligations."); <u>In re Asia Global Crossing, Ltd.</u>, 333 B.R. 199, 204 (Bankr. S.D.N.Y. 2005)(guarantee is "obligation" rather than "transfer" within the meaning of 11 U.S.C. 101(54)), and consequently, the plaintiff cannot rely on NYDCL § 274 to avoid the Guaranty.[10]

**E.    Intent to Incur Debts**

New York DCL § 275 provides:

> Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.

It has been observed that § 275, like NYDCL §§ 273 and 274, involves constructive fraud, and may invalidate a conveyance "without regard to any actual intent to defraud on the part of the grantor or transferor." 30 N.Y. JUR. 2D, CREDITORS' RIGHTS AND REMEDIES, § 338, at 445 (1997); <u>see</u> <u>Sullivan v. Messer (In re Corcoran)</u>, 246 B.R. 152, 159 (E.D.N.Y. 2000)("[t]he intent of the parties to the transaction is irrelevant"); <u>MFS/Sun</u>, 910 F. Supp. at 936.  While true, it only tells part of the story.  Section

---

[10]    In fact, the plaintiff did not rely on this section in his Amended Complaint to avoid the Guaranty.  He did, however, invoke it in the Joint Pre-Trial Order.

29

275 requires proof of the debtor's subjective intent or belief that it will incur debts beyond its ability to pay as they mature.  See <u>MFS/Sun Life</u>, 910 F. Supp. at 943 (noting support for the view that § 275 requires proof of subjective intent); <u>58th Street Plaza Theatre, Inc.</u>, 287 F. Supp. at 498 (finding that corporate taxpayer fraudulently transferred property under NYDCL § 275 when insider knew that the corporation would be unable to pay the federal tax claims if they were upheld); <u>In re Best Prods. Co.</u>, 168 B.R. 35, 52 n. 28 (Bankr. S.D.N.Y. 1994)(NYDCL § 275 requires proof of the transferor's subjective belief that it will incur debts beyond its ability to pay); <u>aff'd</u> 68 F.3d 26 (2d Cir. 1995); <u>Julien J. Studley, Inc. v. Lefrak</u>, 412 N.Y.S.2d 901, 907 (N.Y. App. Div.)(reversing lower court judgment dismissing complaint where, <u>inter alia</u>, the transfers "were made when the corporations knew that debts would be incurred beyond their ability to pay as the debts matured (<u>see</u> Debtor and Creditor Law, § 275)"), <u>aff'd</u>, 401 N.E.2d 187 (N.Y. 1979); <u>see generally</u> PETER A. ALCES, LAW OF FRAUDULENT TRANSACTIONS § 5:47 (updated Nov. 2005), <u>available at</u> Westlaw, FRAUDTRAN § 5:47(under UFCA § 6, "[t]he complaining creditor must show that the grantor

subjectively believed or actually intended that he would incur debts he could not satisfy").[11]

The plaintiff failed to offer evidence at trial showing Nirvana's subjective intent or belief relating to its future debts or its ability to pay those debts. Accordingly, the plaintiff failed to sustain his burden of proving that the Guaranty was a fraudulent obligation under NYDCL § 275.

In conclusion, the plaintiff failed to satisfy his ultimate burden of proving any of the financial conditions required under the NYDCL to avoid a constructively fraudulent obligation, and the defendant is therefore entitled to a judgment dismissing the Amended Complaint. The foregoing constitutes the Court's finding of facts and conclusions of law. Settle judgment on notice.

Dated:    New York, New York
          February 24, 2006

                              /s/ *Stuart M. Bernstein*
                              STUART M. BERNSTEIN
                          Chief United States Bankruptcy Judge

---

[11]    In contrast, the parallel provision of UFTA § 4(a)(2)(ii) imposes an objective standard. It requires proof that "the debtor intended to incur, or believed or <u>reasonably should have believed</u> that he [or she] would incur, debts beyond his [or her] ability to pay as they became due." <u>See</u> 7A, PT. II, ULA 301 (emphasis added).